**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

DUSTECH, LLC,

               **Plaintiff,**

v.                                     **Case No. 21-2199-DDC**

COMPASS MINERALS OGDEN INC.,

               **Defendant.**

_____

## MEMORANDUM AND ORDER

Plaintiff Dustech, LLC—a dust control product company—supplied defendant Compass Minerals Ogden, Inc.—a mineral production company—with dust suppressant oils. Compass claims that in 2018, the quality of Dustech's dust suppressant oils declined, and Compass's customers started complaining about dust. In March 2019, Dustech sent three railcars carrying dust suppressant oils to a transload facility and invoiced Compass for the oils in those three railcars. But Compass didn't want Dustech's oils, and claimed it never ordered the oils from Dustech in the first place. Dustech sued Compass for breach of contract on the theory that the parties' contract required Compass to hire a third-party to inspect the oils before rejecting them. Compass Counterclaimed for breach of contract based the oils' alleged failure to comply with the contract's express warranties.

The motions now pending before the court only address plaintiff's claims, not those in the Counterclaim. That's because neither party aimed their summary judgment practice at the claims asserted in Compass's Counterclaim. This Order follows suit.

The Complaint asserts two claims: breach of contract (Count I) and breach of implied duty of good faith and fair dealing (Count II). Doc. 132 at 11 (Pretrial Order ¶ 4.a.). Plaintiff

moves for summary judgment in its favor on both claims.  Doc. 87.  That motion is fully briefed.  *See* Doc. 88; Doc. 111; Doc. 146-11.  Defendant also moves for summary judgment on the same two claims.  Doc. 105.  The parties fully briefed that motion as well.  *See* Doc. 106; Doc. 145; Doc. 158.

In response to defendant's Motion for Summary Judgment (Doc. 105), plaintiff asks the court to conduct oral argument on that motion (Doc. 148).  Our local rule, D. Kan. Rule 7.2, gives the court discretion to "set any motion for oral argument or hearing at the request of a party or on its own initiative."  Here, the parties' papers adequately present the issues raised by defendant's motion, so oral argument isn't necessary or consistent with Fed. R. Civ. P. 1.  Thus, the court declines to conduct oral argument on this motion.

## I.   Claims at Issue and Procedural Posture

In a case as dense as this one, it's important to understand both:  (a) the claims (and defenses) preserved by the Pretrial Order; and (b) the claims placed at issue by the summary judgment motions.  This subsection identifies the parties' claims and how the summary judgment motions correlate with them.

### A.   Dustech's Claims

Dustech preserved two claims in the Pretrial Order (Doc. 132).

*First*, Dustech asserts a breach of contract claim.  The Pretrial Order describes this claim as one asserting that Compass failed to comply with a contract provision "requiring rejected material to be evaluated by a credible licensed third-party lab."  *Id.* at 11 (Pretrial Order ¶ 4.a.i.).  As Dustech explains in its Reply supporting its motion for summary judgment, Dustech contends that Compass breached the parties' contract in this fashion "by rejecting material without having

it evaluated by a credible, licensed third-party laboratory. . . ."  Doc. 146-11 at 9 (Dustech's memorandum explaining its view of the contract's obligations).

Dustech's view of the parties' contract implicates a second tenet of its claim for breach. Dustech contends that the parties' contract qualifies as a requirements contract.  That is, according to Dustech's view of the contract, Compass expressly agreed to a requirements contract, one obligating Compass "to purchase its good faith requirements of Heavy and Light Oil from Dustech" during the period covered by the contract.  *Id*.  Dustech also advances an alternative version of the contract.  This second alternative contends that even if the parties didn't expressly agree to a requirements contract, their course of dealing with one another impliedly established an exclusive requirements contract for Heavy and Light Oil.  *See id.* at 10–11.  And Dustech even has a third alternate:  it contends, alternatively, that even if Compass didn't promise to buy all of its oil from Dustech, the contract is a non-exclusive requirements contract requiring Compass to buy up to its "annual estimate requirements of Heavy and Light Oil."  *Id.* at 11.  Dustech claims that Compass breached each version of the contract and thus Dustech should recover damages matching the theory of breach accredited by the court.  The court concludes that the parties' written contract can't abide any of Dustech's interpretations of it.

On Dustech's interpretation of the contract's INSPECTION provision, no rational jury could find that the parties' agreement required Compass to inspect the contract's goods before it could reject them.  Instead, the contract's INSPECTION provision provided Compass with a right—it didn't impose a duty.  This right permitted Compass to reject goods for various reasons specified in the contract.  If Compass rejected the contract's goods, those "Rejected Products shall be evaluated by a credible, licensed third-party laboratory[.]"  Doc. 107-2 at 9 (Second

Supply Agreement).  And if this lab's evaluation found the rejected goods were "non-conforming" then Dustech, as seller, owed an obligation to remove and transport them at Dustech's expense.  But as a matter of law, no words in the parties' fully integrated contract can support Dustech's theory of breach that Compass had to inspect Dustech's oils before rejecting them.

This conclusion leaves Dustech's interpretations of the agreement as a requirements contract.  The court grants summary judgment against the claim theorizing that the contract is a requirements contract.  The contract's terms preclude a rational finding that it's a requirements contract.  Nor can the undisputed facts permit a jury to find that the parties' course of dealing established an implied requirements contract.  Last, the summary judgment facts can't abide Dustech's final alternative, the one contending that the parties agreed to a non-exclusive requirements contract obligating Compass to buy as much oil as it estimated it would need annually.  The court explains its rationale for all three conclusions in Part IV, below.

*Second*, Dustech's other claim in the Pretrial Order asserts that Compass breached its implied promise of good faith and fair dealing.  Specifically, this second claim asserts that Compass failed "to comply with the contract provision requiring rejected material to be evaluated by a credible[,] licensed third-party laboratory . . . ."  Doc. 132 at 11 (Pretrial Order ¶ 4.a.ii.).  This alleged breach, the court concludes, starts with a structural deficiency:  by its terms, it theorizes that Compass's behavior violated the contract.  As controlling law[1] recognizes, a contracting party can't recover for breach of an implied promise when its claim relies on an

---

[1]        *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 145–48 (Del. Ch. 2009) (quoting *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992), *aff'd*, 609 A.2d 668 (Del. 1992))("The implied covenant [of good faith and fair dealing] does not apply when 'the subject at issue is expressly covered by the contract.'"); *Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009) ("[T]he implied covenant only applies where a contract lacks specific language governing an issue[.]"), *aff'd*, 976 A.2d 170 (Del. 2009).

express provision of the contract.  This deficiency alone dooms Dustech's claim to summary judgment.  But there's more.

Dustech's only plausible theory of breach of its duty of good faith and fair dealing claims that Compass breached their duty "by unilaterally conducting a trial of a competitor's material without prior notice . . . ."  Doc. 132 at 11 (Pretrial Order ¶ 4.a.ii.).  But this theory begins from the unspoken premise that Compass owed an obligation to buy dust suppressant oil exclusively from Dustech.  *See* Doc. 146-11 at 12 (Dustech Reply).  There, Dustech explains, "[t]he essential ingredient of good faith in the case of a buyer reducing its estimated requirements is that it not merely have had second thoughts about the terms of the contract and want[s] to get out of it."  *Id.* (citing *Vulcan Materials Co. v. Atofina Chems., Inc.*, 355 F. Supp. 2d 1214, 1233 (D. Kan. 2005)).  But as already explained, Dustech's assertion of a requirements contract can't survive summary judgment.  So, this theory of implied breach can't survive summary judgment either.[2]

### B.  Compass's Counterclaim

Compass's Counterclaim claims that Dustech breached express warranties in the contract and thus seeks to recover damages for that breach.  Doc. 132 at 15–17 (Pretrial Order 4.c.).  This Order doesn't address the Counterclaim because the pending motions don't address it.

## II.  Summary Judgment Facts

The following facts either are stipulated in the Pretrial Order (Doc. 132), or uncontroverted for purposes of the parties' summary judgment motions.

---

[2]     To be fair, Dustech also claims that Compass breached this implied duty by "failing to address Dustech's claim and dispute in a forthright and timely manner, and refusing to fully pay Dustech for Materials and damages resulting from Compass' breaches."  *See* Doc. 132 at 11 (Pretrial Order ¶ 4.a.ii.).  But this isn't a recognized or viable form of the duty, for it would create out of whole cloth a claim for implied breach time a claim for breach of contract claim went unsolved.

Defendant Compass Minerals produces salt, plant nutrients, and magnesium chloride for distribution in North America.  Doc. 108-1 at 2 (Blankenstein Decl. ¶ 6).  Defendant's Ogden, Utah facility produces sulfate of potash (SOP) using pond-based feedstock.  *Id.* (Blankenstein Decl. ¶ 5).  Distributors of SOP typically ship it to customers in bulk via railroad cars.  *Id.* (Blankenstein Decl. ¶ 7).  While loading SOP onto the railroad cars, transporting it, and offloading it from the cars, the SOP—without suppressant oil—can create dust.  *Id.* at 3 (Blankenstein Decl. ¶ 8).  To combat dust, Compass coats its SOP product with dust suppressant oils before transporting it.  *Id.* (Blankenstein Decl. ¶ 9).  That's where plaintiff Dustech enters the story.

Dustech sells dust suppressant oils to companies in the fertilizer industry.  *Id.* (Blankenstein Decl. ¶ 10).  On May 1, 2013, the parties entered an initial Supply Agreement— marking the start of a business relationship where Dustech sold dust suppressant oils to Compass.  Doc. 107-1 at 2 (First Supply Agreement).  That agreement remained in effect for five years—from May 1, 2013, to April 30, 2018.  *Id.* at 3 (First Supply Agreement ¶ 5).

After the first agreement expired, the parties entered a Second Supply Agreement on July 13, 2018.  Doc. 107-2 at 4 (Second Supply Agreement).  That's the contract at issue here.  The Second Supply Agreement includes five schedules identified as Schedules A–E.  *See generally id.* at 5–13.  Schedule A provides the fixed prices for products during the initial 24-month period of the contract.  *See id.* at 2, 5 (Schedule A).  Schedule B obligated Compass to provide Dustech with "monthly forecast updates" and an "estimated volume forecast," predicting for the first 12-month period that Dustech would sell Compass 3.2 million pounds of HD-40/HD40M Heavy Oil each year and 225,000 pounds of HD-98 Light Oil each year.  *Id.* at 6 (Schedule B).  Schedule C provides various terms, conditions, and warranties.  *See id.* at 7–10 (Schedule C).  And Schedule

D provides "product specifications" relevant to Schedule C's warranty and inspection provisions. *Id.* at 11–12 (Schedule D).  Schedule E isn't relevant to the current disputes.

### *2018—Compass Started Experiencing Dust Problems*

Compass claims that starting in 2018, it observed an increase of dust complaints from customers.  One customer described the delivered SOP as "extremely dusty" and this condition caused "a lot of fines[.]"  Doc. 108-24 at 2 (June 25, 2018 Customer Complaint).  Another complained that the SOP "was extremely dusty" when the customer unloaded it.  Doc. 108-28 at 2 (April 11, 2019 Customer Complaint).  Compass provided many other, similar examples of customer complaints during the unloading of the product.  *See* Doc. 106 at 15–18 (Def.'s Mem. ¶¶ 41–46).  This uptick in complaints, Compass contends, coincided with Dustech's switch in Heavy Oil suppliers.[3]  *See id.* at 18 (Def.'s Mem. ¶ 47).  Dustech disagrees.  It contends that none of these complaints—descriptions, pictures, or videos—identify a condition caused by its products.  *See* Doc. 145 at 17–18 (Pl.'s Opp'n ¶¶ 42–47).  Regardless of the complaints' cause, Compass decided to look elsewhere for dust suppressant oils.

From mid 2018 to early 2019, Compass conducted trials searching for a replacement source of dust suppressant oil.  *See* Doc. 108-34 at 2 (Martin Decl. ¶ 7); Doc. 108-35 at 7 (Compass's "Trial Goals" included a "trial [of] a new dust suppressant[.]").  In January 2019, Compass began to implement a "Quality Program" requiring Dustech to keep samples of the oil and provide certificates of analysis for its oil shipments to the Alpine Transload facility.  Doc. 108-39 at 2–3 (January 11, 2019 Hollingsworth emails).  Compass also purchased dust

---

[3]     Dustech didn't manufacture the dust suppressant oils it sold Compass—instead, it acquired the oils from third parties and distributed them to customers, including Compass.  *See* Doc. 108-10 (2018 Supply Contract between Dustech and PCM).  In January 2018, Dustech switched its supplier of Heavy Oil from Georgia Pacific to Pine Chemical Makers.  *See* Doc. 108-11 at 6 (Dustech Sales Log).

suppressant oil from ArrMaz—another oil supplier—occasionally from 2016 to 2018.  *See* Doc. 108-1 at 3 (Blankenstein Decl. ¶ 14).

### *January 2019 Purchase Order and Subsequent Communications*

On January 11, 2019, Compass issued a final "blanket" purchase order for HD-40 Oil. *See* Doc. 111-32 (Purchase Order #19660322).  Compass ordered 100,000 gallons of Heavy Oil from Dustech.[4]  *Id.* at 2.  Dustech's Supply Chain Director Aaron Hollingsworth "confirmed and accepted" that Purchase Order via email on January 15, 2019.  *See* Doc. 111-34 at 2 (January 15, 2019 Hollingsworth emails).  Dustech delivered HD-40 Oil to Compass's Alpine Transportation Facility on January 28, 2019.  *See* Doc. 111-35 at 3 (March 8, 2019 emails) ("Our last delivery date of HD-40 was delivered on 1/28/19 against PO #19660322D2").

Two days after that delivery, representatives from the two companies participated in a conference call.  On this January 30, 2019 call, Michael Blankenstein—Compass's Senior Procurement Manager—informed Dustech employees—Johnan Goertz and Aaron Hollingsworth—that Compass was conducting trials of alternative dust suppressants.  Doc. 108-1 at 4 (Blankenstein Decl. ¶ 23).  In his notes from that meeting, Mr. Hollingsworth (Dustech) reported that Compass was "[t]apering off Dustech HD-40 oil while the test [was] going on – maybe 100%, 50%, not sure" and that an "[i]nventory reduction plan" was "needed to avoid costs" associated with Dustech's "commitment to keep [Compass] supplied."  Doc. 108-48 at 2 (January 30, 2019 "Compass Meeting Notes" emails).

### *March 2019—Three Railcars of Unused Heavy Oil at the Alpine Transload Facility*

---

[4]     This Purchase Order provides:  "This is a blanket purchase order for 2019 and is not a guarantee of the quantity or services required."  *Id.* (All caps omitted).  The Purchase Order also includes three pages of terms and conditions.  *See id.* at 3–6.

About five weeks after the late January telephone conference, on March 8, 2019, Dustech informed Compass that Dustech had supplied three railcars to the Alpine Transload with Heavy Oil.  Doc. 108-40 at 2 (March 8, 2019 Email).  In that March 8, 2019 email message, Mr. Goertz (Dustech) informed Mr. Blankenstein (Compass) that Dustech was "very disappointed that a competitor[']s product [was] being trialed at Dustech's expense[.]"  *Id.*  Also, Mr. Goertz's email informed Compass that Dustech had brought the inventory "into Alpine [Transload Facility] to support Compass' production forecast."  *Id.*  This inventory included three railcars—each holding 191,500 pounds of Heavy Oil, amounting to $93,835 each, under the parties' Second Supply Agreement (totalling 574,000 pounds and $281,505).  *Id.*  Mr. Goertz explained that he "would like to invoice [Compass] for the current inventory" because the inventory was "on Dustech's books for quite some time" and Dustech brought it in "to support Compass' forecasted production needs[.]"  *Id.* at 3.

On March 15, 2019, Dustech invoiced Compass $281,505 for the three railcars referenced by the March 8, 2019 correspondence.  Doc. 108-41 at 2 (March 15, 2019 Invoice).  During March and April of 2019, the three railcars of oil remained at the Alpine Transload; Compass refused to accept the railcars or pay the invoice and, after exchanging emails over the course of two months, the parties "reached an impasse on what the contract" required.  *See* Doc. 108-42 at 2–6 (April 2019 emails).

On July 12, 2019, when Compass still had declined to take possession of the three railcars, Dustech sent Compass the following message:

> This notice is to inform you that because you have failed to give us any indication on when you will draw down your product, we must return[] the railcars leased by Dustech and containing the Compass owned HD-40 Dust Suppressant [oil] to our lessors unless the product is paid for in full and consumption of the Product by Compass is begun on or before the end of [the] business day Tuesday, July 16,

2019.  Your failure to take possession of your product will not release you from your financial obligations to Dustech.

Our railcar lessors have been demanding the return of their railcars and we can no longer postpone complying with their demands without being able to provide our lessors with an expected return date of the railcars.

Doc. 108-43 at 2 (July 12, 2019 Email).

### *The Second Supply Agreement's Provisions*

In March 2019, the Second Supply Agreement governed transactions between the parties.

Doc. 107-2 at 4 (Second Supply Agreement).  In relevant part, the Second Supply Agreement

(Doc. 107-2) provides the following terms about price and volume:

**PRODUCTS TO BE PURCHASED.**  Subject to this Agreement, Seller agrees to sell to Compass Minerals the Products on Schedule A (the "Products") incorporated into this Agreement.  The prices shown within Schedule A are in effect as of the Effective Date of this Agreement and are fixed for a twenty four (24) month period.

Doc. 107-2 at 2 (Second Supply Agreement ¶ 1).  The "Inventory Control" provision in

the Second Supply Agreement provides:

**INVENTORY CONTROL.**  Compass Minerals Product *purchase estimate* is shown on Schedule B.  The actual amount of Product that Compass Minerals will purchase will be determined through the Inventory Control Procedures set forth on Schedule B . . . .  Seller's lead-time for railcar deliveries (as applicable) shall not exceed four (4) weeks or twenty eight (28) calendar days barring any unforeseen or uncontrolled delays by the railroads, or unless otherwise agreed upon by both parties.

*Id.* (Second Supply Agreement ¶ 2) (emphasis added and underlines omitted).  Schedule

B—"Inventory Control Procedures and Annual Usage"—governs maintenance of the

product inventory and provides:

Compass Minerals' monthly forecast shall be provided to [Dustech] via email on the first calendar day of each month and shall be reflective of a thirty (30) to forty five (45) day forecasted consumption of products.

Compass Minerals will provide [Dustech] their estimated volume forecast for each twelve (12) month period, with adjusted monthly forecast updates as required. Current estimates of Product volumes are as follows:

1. HD-40/HD-40M Heavy Oil: 3.2mm pounds per year

2. HD-98 Light Oil: 225K pounds per year

*Id.* at 6 (Second Supply Agreements Schedule B).

Schedule B provides that seller—Dustech—"is required to maintain no less than 50% of Compass Minerals' monthly estimated HD-40/HD-40M Heavy Oil and HD-98 Light Oil volume usage on-hand at all times." *Id.* (Second Supply Agreement Schedule B).  This schedule also provides that Dustech is "responsible for the management, maintenance, and scheduling for the HD-40/HD-40M and HD-98 product inventory, based upon Compass Minerals' timely communication of monthly forecast updates to" it.  *Id.* (Second Supply Agreement Schedule B).

The Second Supply Agreement includes a merger clause.  This "Entire Agreement" provision states:

**ENTIRE AGREEMENT.**  This Agreement and all other documents incorporated herein by reference, including the Schedules attached hereto and any purchase orders issued by Compass Minerals, constitute the entire agreement between the parties concerning the subject matter hereof and supersede all prior and contemporaneous agreements between the parties concerning the subject matter hereof.  This Agreement may be amended only by an instrument in writing that expressly refers to this Agreement and specifically states that it is intended to amend it and that is signed by the duly authorized representatives of all parties.  No party is relying upon any warranties, representations or inducement not set forth herein.  In the event of a conflict between this Supply Agreement document and Schedule C, the terms of this Supply Agreement control.

*Id.* at 4 (Second Supply Agreement ¶ 9) (underline omitted).

### *Alleged Breach:  Failure to Inspect the Oil*

Dustech claims that Compass breached the Agreement by failing to validate the oil's alleged non-conformity with a credible and licensed third-party laboratory after it refused to

11

accept the three railcars of HD-40 Heavy Oil.  *See* Doc. 132 at 11 (Pretrial Order ¶ 4.a.i.).  The contract's provisions relevant to this theory of breach are set forth, below.

The "Warranty" provision in Schedule C provides:

> **WARRANTY.**  Seller expressly warrants that it is the owner of good and clear title to all Products and/or has all necessary authority to transfer to Compass Minerals good and clear title to all Products.  **Seller expressly warrants that all Products furnished under this Agreement shall conform to all specifications and appropriate standards included in <u>Schedule D</u> and will be free from material defects in material or workmanship** . . . . If Seller knows of or has reason to know the particular purposes for which Compass Minerals intends to use the Products, Seller warrants that such goods will be fit for such particular purposes.  All such warranties shall survive inspection, test, acceptance, and use, and shall run to Compass Minerals, its successors, assigns and Buyers and users of Products sold by Compass Minerals.  **Seller agrees that in the event that any material nonconformity with Seller's warranty is discovered, such non-conformity will be validated by a credible and licensed third-party laboratory at Seller's expense.**  In addition to any other remedy available to Compass Minerals, Seller shall be liable for the cost of replacement and transportation of such Products if the credible and licensed third-party laboratory determines the Product tested to be non-conforming to the specifications included in <u>Schedule D</u>.

Doc. 107-2 at 7 (Second Supply Agreement Schedule C ¶ 4) (emphasis added).

Schedule C's "Inspection" provision states:

> **INSPECTION.**  All Products shall be subject to inspection and test by Compass Minerals for a reasonable period.  **Compass Minerals shall have the right to reject Products, which are found to be non-conforming with Seller's specifications listed in <u>Schedule D</u>, are not fit for the purposes intended by Compass Minerals, contain defective material, or are not in conformity with the Agreement.  Rejected Products shall be evaluated by a credible, licensed third-party laboratory, and if found to be non-conforming, be removed by Seller promptly after notification or rejection, at the expense of Seller,** including transportation both ways, for credit on the purchase price, or, at Compass Minerals' option, correction of defects.  Failure on the part of Compass Minerals to inspect any Products does not relieve the Seller from liability in the event that Products not meeting the requirements should be determined at a later date.  In the event that the Product in question is found to be conforming to the specifications outlined in <u>Schedule D</u>, Seller shall recover all associated costs incurred for the Product in question from Compass Minerals.

*Id.* at 9 (Second Supply Agreement Schedule C ¶ 13) (emphasis added).

Both the WARRANTY and INSPECTION provision turn on whether Dustech's product conforms with the specifications from "Schedule D" of the Agreement.  Schedule D provides the following "Product Specifications" for the HD-40 Oil:

a. **Product Purpose.**  HD-40 is an environmentally friendly dust suppressant and anti-caking agent that provides long-term control

b. **Product Description.**  HD-40 is intended to provide long-term dust control and anti-caking on commodity fertilizers, specialty fertilizers, secondary and micronutrient fertilizers and construction aggregates.

c. **Derived From.**  Tall Oils, Rosins and Vegetable Oils

d.  **Product Attributes.** Excellent dust control, captures dust generated during transit, anti-caking properties, environmentally safe/friendly, carcinogen free, made from renewable resources

e. **Regulatory Specifications Met.**  GRAS, non-petroleum

f. **Physical Properties.**

    i. **Odor.** Tar-like
    ii. **Color.** Brown
    iii. **Solubility.** Insoluble in cold or hot water
    iv. **Flash point.** >500 degrees F
    v. **Boiling Point.** >600 degrees F
    vi. **Density.** 8 lbs. per gallon
    vii. **Consistency.** Liquid (Molten liquid or solid)

**g. Packaging.**  Drum, bulk truck or railcar

**h. Supplier.**  Dustech LLC, 100 North Tampa Street, Suite 1660, Tampa, FL 33602

Doc. 107-2 at 11 (Second Supply Agreement Schedule D ¶ 1).[5]

---

[5]    These provisions in the Agreement are also relevant to Compass's Counterclaim—asserting claim for breach of contract—and Compass's affirmative defense.  Compass alleges that Dustech breached the Warranty Provision of their Agreement when it supplied a product that didn't conform with the specifications and appropriate standards specified in the Agreement.  Also, Compass asserts an affirmative defense claiming that Dustech breached the parties' contract before any alleged breach by Compass.

### III.   Legal Standard

Summary judgment is appropriate when the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'"  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'"  *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at

671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

"Unsubstantiated allegations carry no probative weight in summary judgment proceedings."

*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*,

956 F.2d 949, 951 n.3 (10th Cir. 1992)).  To survive summary judgment, the non-moving party's

"evidence, including testimony, must be based on more than mere speculation, conjecture, or

surmise."  *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999)).

The federal courts don't view summary judgment as a "disfavored procedural shortcut."

*Celotex*, 477 U.S. at 327.  To the contrary, it's an important procedure "designed 'to secure the

just, speedy[,] and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

While a court can treat cross motions for summary judgment separately, and "the denial

of one does not require the grant of another[,]" *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431,

433 (10th Cir. 1979), it may also address the legal arguments together, *Berges v. Standard Ins.*,

704 F. Supp. 2d 1149, 1155 (D. Kan. 2010).  Here, the two motions, and their legal arguments,

overlap one another almost entirely.  Thus, the court addresses the legal arguments together.

## IV.   Breach of Contract Claim (Count I):  Did the Second Supply Agreement obligate Compass to purchase Heavy Oil from Dustech?

The parties agree that Delaware law and the Delaware Commercial Code govern this

case.[6]  *See* Doc. 123 at 2 (Pretrial Order ¶ 1.d.); Doc. 107-2 at 10 (Second Supply Agreement ¶

18 (choice of law provision providing Delaware law applies when Compass Minerals is

---

[6]      Applying Delaware law here also conforms to Kansas choice of law rules.  A federal court exercising diversity jurisdiction must apply the choice of law rules of the state where the court sits—here, Kansas choice of law rules apply.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  In Kansas, when the parties to a contract have made an agreement that incorporates a choice of law provision, Kansas courts generally apply the law chosen by the parties to control their agreement.  *Brenner v. Oppenheimer & Co. Inc.*, 44 P.3d 364, 375 (Kan. 2002).  The parties' contract here contains a Delaware choice of law provision.  *See* Doc. 107-2 at 10 (Second Supply Agreement ¶ 18).

incorporated or organized in the United States)).  Under Delaware law, Article 2 of the Uniform

Commercial Code (UCC), as adopted by Delaware, governs actions involving sales of goods.

*See* 6 Del. Code Ann. Tit. 6, § 2-102; *Barlow v. Delhaize Grp.*, No. C.A. 08-565-MPT, 2009 WL

1391413, at *7 (D. Del. May 15, 2009) ("[W]hen dealing with the sale of goods, under Delaware

law, such actions are controlled by the Uniform Commercial Code[.]").

 "Under Delaware law, the elements of a breach of contract claim are:  1) a contractual

obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the

plaintiff."  *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) (citation

omitted).  But, a party who materially breaches a contract first cannot recover if the other party

to the contract later breaches.  *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch.

2003).

 While Compass asserts several reasons why the court should grant summary judgment

against plaintiff's breach of contract claim, the court need only consider one of them.  This

argument reasons that Dustech can't establish that Compass breached any obligation under the

contract because the contract didn't obligate Compass to purchase *any* Heavy Oil from Dustech.

 Compass argues that Dustech's theory of recovery—damages for lost profits on Heavy

Oil—relies on the false premise that the contract obligated Compass to buy Heavy Oil from

Dustech.  Specifically, Compass asserts that the Agreement unambiguously imposed no

obligation on Compass to purchase Heavy Oil from Dustech because, under Delaware law the

contract:  (1) wasn't an exclusive "requirements contract" and (2) didn't impose a minimum

purchase requirement.  Dustech counters, asserting that the course of dealing between the parties

established a valid "requirements contract" and the parties' Agreement specified the quantity of

product Compass would purchase.  Subparts A. and B., following, take on these competing

points.  The court finds that the undisputed facts—even when viewed in the light most favorable

to Dustech[7]—establish that Compass owed no contractual obligation to purchase Heavy Oil.

**A.  Did the parties enter a "requirements contract"?**

Delaware Code § 2-306—adopting UCC §2-306—sets forth principles governing output,

requirements, and exclusive dealing contracts.[8]  *See* Del. Code Ann. Tit. 6, § 2-306.  It provides:

> (1) *A term which measures the quantity by* the output of the seller or *the*
> *requirements of the buyer means* such actual output or requirements as may occur
> in good faith, except that no quantity unreasonably disproportionate to any stated
> estimate or in the absence of a stated estimate to any normal or otherwise
> comparable prior output or requirements may be tendered or demanded.
>
> (2) A lawful agreement by either the seller or the buyer for *exclusive dealing* in the
> kind of goods concerned imposes unless otherwise agreed an obligation by the
> seller to use best efforts to supply the goods and by the buyer to use best efforts to
> promote their sale.

*Id.* (emphasis added)*.*  Under Delaware law, a "requirements contract is a contract in which the

buyer *expressly* agrees to buy all of the buyer's requirements of a stated item exclusively from

the seller who agrees to sell that amount to the buyer."  *See Ampro Computs., Inc. v. LXE, LLC*,

No. 13-1937-LPS, 2015 WL 5257153 at *4 (D. Del. Sept. 9, 2015) (applying Delaware law)

---

[7]      When considering Compass's arguments for summary judgment, the court must view the
summary judgment facts in favor of Dustech, the non-moving party.  *See Scott v. Harris*, 550 U.S. 372,
378 (2007) (explaining that courts state facts in the light most favorable to the party opposing summary
judgment); *see also Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000) ("When
reviewing cross-motions for summary judgment . . . [the court must] construe all inferences in favor of
the party against whom the motion under consideration is made[.]" (citation and internal quotation marks
omitted)).

[8]      As acknowledged by both parties, our country's courts—including Delaware courts interpreting
Delaware's version of the Uniform Commercial Code—look to decisions from other state and federal
courts when analyzing common provisions of the UCC.  *See Peninsula Methodist Homes & Hosps., Inc.*
*v. Architect's Studio, Inc.*, No. C.A. 83C-AU-118, 1985 WL 634831, at *4 (Del. Super. Ct. Aug. 28,
1985) (citing South Dakota, Connecticut, Illinois, and Pennsylvania UCC decisions).  *See also Specialty*
*Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1175 (10th Cir. 2008) ("In the UCC context,
decisions from other jurisdictions are particularly persuasive due to the uniform nature of the UCC").

(citation and internal quotation marks omitted) (emphasis added); *see also Fisherman Surgical Instruments, LLC v. Tri-anim Health Servs., Inc.*, 502 F. Supp. 2d 1170, 1177 (D. Kan. 2007) (interpreting identical Kansas UCC statute) ("For a requirements contract to be valid, the buyer must promise to buy the goods *exclusively* from the seller." (emphasis added)).  Compass argues that the Second Supply Agreement isn't a "requirements contract" under Delaware UCC § 2-306. The court agrees.  As following two subsections explains:  (1) the parties' contract doesn't explicitly provide for an exclusive relationship, and (2) the parties' course of dealing didn't create an implied exclusive relationship.

### 1.  Did the Second Supply Agreement explicitly provide for an exclusive relationship?

The parties' Agreement provides no term that "measure[d] the quantity by . . . the requirements of the buyer" or made Dustech the exclusive seller of dust suppressant oil to Compass.  *See* Del. Code Ann. Tit. 6, § 2-306.  In short, Compass never "expressly agree[d] to buy all of [its] requirements" of Heavy Oil "exclusively from" Dustech.  *See Ampro Computers, Inc.*, 2015 WL 5257153 at *4 (citation and internal quotation marks omitted).  Indeed, Compass argues, the contract's plain language shows that Compass wasn't obligated to purchase any Heavy Oil from Dustech.

Compass lists the following contract provisions as support for its proposition:

- "[Dustech] is required to maintain no less than 50% of Compass Minerals' monthly estimated HD-40/HD-40M Heavy Oil and HD-98 Light Oil volume usage on-hand at all times.  With collaboration from Compass Minerals, [Dustech] is responsible for the management, maintenance, and scheduling for the HD-40/HD-40M and HD-98 product inventory, **based upon Compass Minerals' timely communication of monthly forecast updates to [Dustech]**."  Doc. 107-2 at 6 (Second Supply Agreement Schedule B) (emphasis added).

- "[Dustech's] **lead-time for railcar deliveries** (as applicable) shall not exceed four (4) weeks or twenty eight (28) calendar days barring any unforeseen or uncontrolled delays by the railroads, or unless otherwise agreed upon by both

parties." *Id.* at 2 (Second Supply Agreement ¶ 2 "Inventory Control") (emphasis added).

- "Compass Minerals will provide [Dustech] their **estimated volume forecast** for each twelve (12) month period, **with adjusted monthly forecast updates as required.**" *Id.* at 6 (Second Supply Agreement Schedule B) (emphasis added).

- "Compass Minerals' **monthly forecast shall be provided to [Dustech]** via email on the first calendar day of each month and shall be reflective of a thirty (30) to forty five (45) day forecasted consumption of products." *Id.* (Second Supply Agreement Schedule B) (emphasis added).

*See* Doc. 106 at 27–28 (Def.'s Mem. in Support of its Mot. for S.J.) (listing these provisions of the contract and adding emphases shown here).

But Dustech would have the court read these provisions differently, asserting that these provisions—and a few others—qualify the parties' Second Supply Agreement as a "requirements" contract under § 2-306.  Dustech argues that the Agreement "specified the amount of product Compass would purchase in Schedule B, Inventory Control Procedures and Annual Usage."  Doc. 145 at 31 (citing Doc. 107-2 at 2 (Second Supply Agreement ¶ 2)).  And it's true that "Schedule B set forth Compass' estimated volume forecast for each twelve-month period."  *Id.* (citing Doc. 107-2 at 6 (Second Supply Agreement Schedule B)).  Dustech relies on these two provisions from Schedule B:

- Compass's "[c]urrent estimate of Product Volumes are . . . 3.2 [million] pounds per year" of HD-40/HD40M Heavy Oil, and "225 [thousand] pounds per year of HD-98 Light Oil."  Doc. 107-2 at 6 (Second Supply Agreement Schedule B).

- "[Dustech] is required to maintain no less than 50% of Compass Minerals' monthly estimated HD-40/HD-40M Heavy Oil and HD-98 Light Oil volume usage on-hand at all times."  *Id.* (Second Supply Agreement Schedule B).

*See* Doc. 145 at 31.  Taken together, Dustech argues, these contract terms established "Compass' complete requirements for Heavy and Light Oil per year" and "Dustech's output of Heavy and Light Oil per month for Compass."  *Id.*  Dustech notes that Compass had the "responsibility to

communicate monthly forecast updates to Dustech[,]" and any failure to communicate a monthly forecast update, would lead the parties to use Schedule B's annual estimate to estimate inventory needs. *Id.* (citing Doc. 107-2 at 5 (Second Supply Agreement Schedule B)).

Cases interpreting similar contracts governed by the UCC convince the court that the Second Supply Agreement isn't an exclusive requirements contract.

###    a. *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373 (7th Cir. 2000)

To support its argument that the Second Supply Agreement doesn't amount to a "requirements contract," Compass cites the Seventh Circuit's decision in *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373 (7th Cir. 2000).  Compass argues that *Brooklyn Bagel Boys* decided the same issue—whether a contract between a buyer and seller qualified as a requirements contract under "a nearly identical supply agreement" governed by Illinois law (UCC § 2-306).  *See* Doc. 106 at 26.  The district court granted summary judgment for the buyer, holding that the contract wasn't an exclusive "requirements contract" and thus didn't obligate the buyer to continue ordering its bagel requirements from the seller after giving notice to terminate.  *See Brooklyn Bagel Boys*, 212 F.3d at 382.  The Seventh Circuit affirmed.  *Id.*

In this case, "Brooklyn Bagel" sued "Earthgrains," claiming that Earthgrains wrongfully had terminated the parties' contract for supplying bagels.  *Id.* at 375.  The parties' contract "provided a price structure for the bagels" but didn't require Earthgrains—the buyer—to "purchase a specific quantity of bagels[.]"  *Id.* at 376.  Instead, the contract stated that Brooklyn Bagel must "process and package the 'order quantity' of bagels."  *Id.*  Also, the contract required Earthgrains to "provide a non-binding forecast every three months . . . for its expected bagel orders."  *Id.*  And, the parties agreed, the contract would "'continue in effect until either party

terminates it upon ninety (90) days prior written notice to the other party of such termination[.]'"
*Id.* The Seventh Circuit "agree[d] with the district court that the Contract [was] not a requirements contract" because it didn't "expressly obligate Earthgrains to purchase all, or any specified quantity, of its requirements of bagels . . . from Brooklyn Bagel." *Id.* at 378. The Seventh Circuit affirmed the district court's characterization of the agreement as a "buyer's option," that is, an agreement between a buyer and a seller defining the price and specifications of a product over a specified period, but not stipulating the quantity of product the buyer was obligated to purchase. *Id.* The Circuit termed the seller's "contention that the parties intended for [it] to be the sole supplier of bagels" unconvincing because the "parties surely could have included this term in the Contract had they desired." *Id.* at 380.

Dustech contends that the contract in the current case—the Second Supply Agreement—differs from the contract in *Brooklyn Bagel Boys* because the contract there provided that "upon order by [the buyer], [the seller] will process and pack the ordered quantify," and the seller "shall not produce Product in advance of the order, and in no event shall it produce more than 104% of any quantity of Produce ordered" by the buyer. Doc. 145 at 33 (quoting *Brooklyn Bagel Boys*, 212 F.3d at 378). Dustech contrasts this language with the words in Schedule B of the Second Supply Agreement—language that required Dustech to "maintain no less than 50% of Compass Minerals' monthly estimated [Oil] volume usage on-hand at all times." *Id.* (citing Doc. 107-2 at 5 (Second Supply Agreement Schedule B)). The court apprehends Dustech's position: the *Brooklyn Bagel Boys* contract explicitly instructed the seller, in essence, not to produce bagels until it received an order. In contrast, the Agreement here instructed Dustech to have its products stocked and ready for purchase when Compass elected to order them. But that distinction doesn't negate the persuasiveness of the Seventh Circuit's ruling.

The Seventh Circuit's opinion provides a useful guide for distinguishing between *what is* and *what's not* a requirements contract:

> Brooklyn Bagel cannot point to any contractual language indicating that it would be a breach of contract for Earthgrains to either (1) stop ordering from Brooklyn Bagel, (2) use another manufacturer, or (3) manufacture its own bagels. . . . Instead, the Contract provided an agreement by Brooklyn Bagel to manufacture bagels for Earthgrains at a specified price, within an agreed period, subject to Earthgrains' bagel needs.

*Brooklyn Bagel Boys*, 212 F.3d at 377.  The contract language here parallels those components of the *Brooklyn Bagel Boys* contract.  That is, the Second Supply Agreement provides volume estimates and lead times, but includes no language that "(1) obligates the buyer to buy goods, (2) obligates the buyer to buy goods exclusively from the seller, and (3) obligates the buyer to buy all of its requirements for goods of a particular kind from the seller."  *See id.* (applying Illinois law) (quoting *Zemco Mfg., Inc. v. Navistart Int'l Transp. Corp.*, 186 F.3d 815, 817 (7th Cir. 1999) (citing James J. White & Robert S. Summers, Uniform Commercial Code § 3-9, at 154–55 (1995) (further citations omitted))).

The undisputed language in the Second Supply Agreement at issue here belongs in the second category, *i.e.*, no language in it precludes Compass from endings its orders from Dustech. And no language prohibits Compass from using another manufacturer to supply the dust suppressant oils Compass needed.  Instead, the Second Supply Agreement provided Compass the right to buy Heavy Oil from Dustech at a specified price, within an agreed period, subject to its needs—and Compass was bound to provide monthly updates of its forecasted consumption, as necessary.  Those characteristics don't make the contract a requirements contract.

**b.  Additional Cases Determining Whether Contracts Qualified as Requirements Contracts under UCC § 2-306**

Compass explains that the Second Supply Agreement allowed Compass flexibility to opt in and out of purchasing from Dustech, and likewise gave Compass power to adjust forecasted purchases of Heavy Oil.  This arrangement gave Dustech lead time to manage and schedule shipment.  This type of agreement, Compass argues, is typical for an agreement between a purchaser and supplier and many courts—construing similar UCC § 2-306 provisions—have held that such agreements don't amount to requirements contracts when the buyer didn't promise to buy its "requirements" exclusively from the seller.  *See* Doc. 106 at 29 (first citing *Propane Indus., Inc. v. Gen. Motors Corp.*, 429 F. Supp. 214, 219 (W.D. Mo. 1977) (explaining that "[a]n essential element of the valid requirements contract is the promise of the buyer to purchase exclusively from the seller" and, without such a promise, the agreement "becomes merely an invitation for orders and a contract is not consummated until an order for a specific amount is made by the buyer" (citations omitted) (interpreting Kansas's adopted UCC § 2-306)); then citing *Mid-Am. Salt, LLC v. Morris Cnty. Coop. Pricing Council*, 964 F.3d 218, 228 (3d Cir. 2020) (affirming dismissal where the parties' contract—one requiring a supplier of bulk rock salt to provide salt to a cooperative pricing council at certain prices as needed—wasn't a requirements contract under New Jersey's UCC (N.J. Stat. Ann. § 12A:2-306(1)) because it didn't "clearly state that it was for 'requirements,'" it didn't "mention the world exclusive[,]" and it simply required the buyers to "buy salt in such quantities 'as may be desired' or as they 'may want'"); and then citing *Integrated Micro Sys., Inc. v. NEC Home Elecs. (USA), Inc.*, 329 S.E.2d 554, 556 (Ga. Ct. App. 1985) (explaining under Georgia's UCC § 2-306 that "no true requirements contract [exists] unless the buyer is under an obligation to purchase all of its requirements from the seller.  In the absence of such an obligation, there is no requirements

contract and the promise of the seller becomes merely an invitation for orders and a contract is not consummated until an order for a specific amount is made by the buyer." (citations and internal quotation marks omitted))).[9]

## 2. Did the parties' course of dealing create an implied exclusive relationship?

Convinced that the parties didn't agree explicitly to an exclusive relationship for the covered oils, the court turns to Dustech's alternative argument. It contends that the parties' course of dealing between May 2013 and 2019 created an exclusivity requirement *implicit* in the Second Supply Agreement.[10]

Under the UCC, "no special language is necessary to create a requirement contract." *Porous Media Corp. v. Midland Brake, Inc.*, 220 F.3d 954, 960 (8th Cir. 2000). And courts indeed have held that parties can establish a valid requirements contract based on their course of dealing. *See Cyril Bath Co. v. Winters Indus., a Div. of the Whittaker Corp.*, 892 F.2d 465, 467 (6th Cir. 1989) (affirming district court holding under UCC § 2-306 that the promise to purchase exclusively from one supplier may be implicit or explicit and district court's finding that defendant "implicitly promised to purchase its tubes from" plaintiff where plaintiff was aware of

---

[9]     Dustech tries to distinguish between the contracts at issue in these three cases and the Second Supply Agreement at issue here. In *Mid-American Salt*, the contract explicitly provided that buyer had "no obligation to purchase that quantity during the contract period." *Mid-Am. Salt, LLC*, 964 F.3d at 223. And, in *Propane Industries* and *Integrated Micro Systems*, the sellers acknowledged that the buyers could purchase their product elsewhere or that they weren't the sole suppliers of the pertinent goods. The court recognizes these distinctions, and thus addresses Dustech's argument—*see* Doc. 145 at 32–34—that it *believed* it was the exclusive supplier of Heavy Oil for Compass.

[10]     Dustech never argues that a specific provision of the parties' contract is ambiguous. In fact, it never directly argues that the Second Supply Agreement *is* ambiguous. Instead, it states that "when provisions in controversy are fairly susceptible of different interpretations . . . there is ambiguity" and urges the court to construe any ambiguity in its favor. *See* Doc. 145 at 30. Then it argues that the parties' course of dealing established an implied exclusive requirements contract. *See id.* at 32. Even giving Dustech the benefit of that assumption—that the contract contains an ambiguity—Dustech's claim can't survive summary judgment because their course of dealing won't permit a won't permit a finding of facts essential to an implied requirements contract.

defendant's needs and the contract specified the number of tubes); *Universal Power Sys., Inc. v. Godfather's Pizza, Inc.*, 818 F.2d 667, 671 (8th Cir. 1987) (interpreting Missouri's adopted UCC § 2-306 and affirming holding that oral "requirements contract" existed and didn't fail for lack of exclusivity where "uncontroverted prior course of dealings between [defendant] and [plaintiff] showed that [plaintiff] had been [defendant's] sole and exclusive supplier of thin crust pans for three and one-half years").

Trying to make this case's summary judgment facts fit the implicit requirements contract theory recognized in *Cyril Bath* and *Universal Power System*, Dustech argues that from May 2013 to April 2018, it sold HD-40 Oil to Compass. And until 2019, when Compass rejected the three railcars worth of Heavy Oil, Dustech contends it always believed it was Compass's sole supplier of that commodity. But the summary judgment facts reject Dustech's argument.

Specifically, it's undisputed that Compass purchased dust suppressant oil from ArrMaz—another oil manufacturer—occasionally from 2016 to 2018. *See* Doc. 108-1 at 3 (Blankenstein Decl. ¶ 14). The purchases from ArrMaz—an arrangement, Compass contends, that Dustech knew about—precludes any possibility that an implicit exclusive requirements contract formed by virtue of the parties' performance.

Compass's argument that Dustech knew about its use of another oil supplier relies on emails exchanged between a Dustech employee—Mr. Hollingsworth—and two Compass employees. *See* Doc. 108-2 (October 2016 emails); Doc. 108-47 (August 2017 emails). In the earlier communication—the 2016 emails—Mr. Hollingsworth (Dustech) acknowledged his understanding that Compass was "wanting a second supplier for financial purposes." *See* Doc. 108-2 at 2 (October 2016 emails). In the later email from 2017, Mr. Hollingworth (Dustech)

recited his awareness that Compass had "asked for an updated price saying ArrMaz [was] back in the picture."  Doc. 108-47 at 2 (August 2017 emails).

The point of these communications was sharpened in Mr. Hollingsworth's deposition, when counsel asked him about an email sent during the October 2016 correspondence. Specifically, Mr. Hollingsworth, Dustech's employee, testified as follows:

> Q:  Did Dustech know that Compass was using other HD-40 suppliers?
> A:  I didn't know that there was another supplier of HD-40.
> Q:  Let me rephrase.  Did Dustech know that Compass was using another supplier as an alternative to HD-40?
> A:  Yes.  In this e-mail it says, you know, that I knew.

Doc. 145-4 at 18 (Hollingsworth Dep. 68:18–69:2) (objection omitted).  The testimony conforms to Mr. Hollingsworth's email correspondence, where he acknowledged his understanding that Compass wanted "a second supplier for financial purposes."  *See* Doc. 108-2 (October 2016 emails).[11]

This testimony establishes as undisputed fact that Dustech knew Compass was purchasing dust suppressing oil from a supplier other than Dustech during the period when— according to Dustech—the course of performance purportedly established an exclusive arrangement between Dustech and Compass.  Given Dustech's admitted knowledge, no reasonable jury could find that the parties' course of dealing created an implicit requirements contract obligating Compass to buy all dust suppressing oil it purchased from Dustech.[12]

---

[11]     The deposition transcript refers to an "October 2nd email that's on this chain" but, in context, it's evident that counsel's question is referring to the October 7, 2016 email.  *Compare* Doc. 145-4 at 18 (Hollingsworth Dep. 67:24–69:2), *with* Doc. 108-2 at 2 (October 2016 emails).

[12]     Dustech also cited part of Mr. Hollingsworth's testimony claiming it supports the proposition that Dustech was unaware of other HD-40 suppliers.  *See* Doc. 145 at 32 (Pl.'s Opp'n) (citing Mr. Hollingsworth's testimony at page 68 of his deposition).  In the passage cited by Dustech, after he was asked, "Did Dustech know that Compass was using other HD-40 suppliers?" Mr. Hollingsworth answered, "I didn't know that there was another supplier of HD-40."  Doc. 145-4 at 18 (Hollingsworth Dep. at 68:18–20).  But Dustech's argument ignores the entirety of Mr. Hollingsworth's testimony.  In the

In sum, neither version of Dustech's claim that it and Compass formed a requirements contract can survive summary judgment.  The parties' Second Supply Agreement never uses any words explicitly imposing an exclusive relationship obligating Compass to buy all dust suppressing oil it required from Dustech.  This absence precludes a reasonable jury from finding that the parties explicitly agreed to a requirements contract.  And on Dustech's alternative theory—that the parties' course of dealing impliedly established an exclusive requirements contract—the undisputed facts establish that:  (a) Compass didn't buy dust suppressant oil exclusively from Dustech during the relevant period; and (b) Dustech's representative knew that Compass purchased such oil from another supplier.  These summary judgment facts preclude the implicit requirements contract theory recognized by some courts.  The court thus holds that Compass deserves summary judgment against Dustech's requirements contract theory.

**B.  Even if not a requirements contract, did the Second Supply Agreement impose an "enforceable" quantity term?**

The court's holding rejecting Dustech's requirements contract theories doesn't preclude Dustech's third theory, *i.e.*, that the Second Supply Agreement obligated Compass to buy its oil.  Specifically, Dustech asserts that even if not an exclusive arrangement, the Second Supply Agreement qualifies as a "nonexclusive" requirements contract.  *See* Doc. 145 at 32–33 (Pl.'s Opp'n).  This section addresses that alternative theory.

Dustech correctly asserts that the Second Supply Agreement includes Compass's estimates of Heavy Oil requirements for each year and required Dustech to maintain "on-hand at all times" at least 50% of Compass's monthly estimate.  *See* Doc. 107-2 at 6 (Second Supply

---

question and answer immediately following this exchange, Mr. Hollingsworth explicitly admitted that his email correspondence concedes his awareness that Compass "was using another supplier as an alternative to HD-40"—the product identified in Dustech's Agreement with Compass. *Id.* (Hollingsworth Dep. 68:22–69:2).

Agreement Schedule B) ("[Dustech] is required to maintain no less than 50% of Compass Minerals' monthly estimated HD-40/HD-40M Heavy Oil and HD-98 Light Oil volume usage on-hand at all times.").  In response, Compass argues that the parties' Agreement—specifically, Schedule A and Schedule B—includes no agreement explicitly obligating Compass to purchase a minimum volume or quantity from Dustech.  *See* Doc. 106 at 32–33 (first citing Doc. 107-2 at 5 (Second Supply Agreement Schedule A);[13] then citing *id.* at 6 (Second Supply Agreement Schedule B)).[14]  And without minimum volume requirements, Compass argues, no "non-exclusive requirements contract" can exist.  Dustech counters, contending that the Second Supply Agreement sets forth enforceable quantity terms by specifying Compass's annual estimated forecast for Heavy and Light Oil for the year.  *See* Doc. 145 at 33 (citing Doc. 107-2 at 5 (Second Supply Agreement Schedule B)).

---

[13]     Schedule A of the Agreement—called "Product and Pricing"—lists the prices of Dustech's different oil options based on delivery method.  Doc. 107-2 at 5 (Second Supply Agreement Schedule A).

[14]     Schedule B—"Inventory Control Procedures and Annual Usage"—provides that the seller, Dustech, "is required to maintain no less than 50% of Compass Minerals' monthly estimated HD-40/HD-40M Heavy Oil and HD-98 Light Oil volume usage on-hand at all times."  Doc. 107-2 at 6 (Second Supply Agreement Schedule B).  It explains that Dustech is "responsible for the management, maintenance, and scheduling for the HD-40/HD-40M and HD-98 product inventory, based upon Compass Minerals' timely communication of monthly forecast updates to" Dustech.  *Id.*  Schedule B governs the product inventory maintenance, providing:

> Compass Minerals' monthly forecast shall be provided to [Dustech] via email on the first calendar day of each month and shall be reflective of a thirty (30) to forty five (45) day forecasted consumption of products.

> Compass Minerals will provide [Dustech] their estimated volume forecast for each twelve (12) month period, with adjusted monthly forecast updates as required.  Current estimates of Product volumes are as follows:

> 1. HD-40/HD-40M Heavy Oil: 3.2mm pounds per year
> 2. HD-98 Light Oil: 225K pounds per year

*Id.*

Dustech argues that a "nonexclusive requirements contract" is valid if it contains "a sufficient basis to determine an enforceable quantity term."  *See id.* at 32.  Dustech supports this position with citations to the following four cases:

- *Cyril Bath Co. v. Winters Industries a Division of the Whittaker Corp.*, 892 F.2d 465, 466 (6th Cir. 1989) (While manufacturer didn't explicitly promise to buy metal tubes from seller, requirements contract existed where the contract "specifically stated that the prices 'are based on a three year program with annual production requirements' of 800,000 tubes in each of the first two years and 400,000 tubes in the third year") (interpreting UCC § 2-306);

- *Hoover's Hatchery, Inc. v. Utgaard*, 447 N.W.2d 684, 688 (Iowa Ct. App. 1989) (holding that buyer needn't bind itself to purchase *all* of its requirements from a particular seller but, instead, a requirements contract may include "stated estimates as to a buyer's requirements" (interpreting Iowa law identical to UCC § 2-306);

- *Pepsi-Cola Bottling Co. v. Woodlawn Canners, Inc.*, No. 6161, 1983 WL 18017, at *2 (Del. Ch. Mar. 14, 1983) (concluding valid requirements contract existed where seller "agrees to sell to Bottler not less than two-thirds (2/3) of Bottler's requirements") (applying Ohio's adopted UCC § 2-306); and

- *General Motors Corp. v. Paramount Metal Products Co.*, 90 F. Supp. 2d 861, 874 (E.D. Mich. 2000) ("[A] requirements contract may exist where 'all or some of'

the purchaser's requirements are purchased from the seller" (construing Ohio's

UCC § 2-306)).[15]

But as Compass correctly asserts in its Reply, all four of Dustech's cases involved

contracts containing explicit language obligating the buyer to buy a specified quantity or

proportion of its "requirements" from the contracting seller.  There's nothing like that in

Dustech's contract with Compass.  The Second Supply Agreement contains no explicit

discussion of "requirements"—partial or total.

Dustech—the proponent of the idea that the parties entered an agreement with an

enforceable quantity term—can't carry its burden on summary judgment.  With no explicit words

in the governing agreement, Dustech's requirements and partial requirements arguments fall

short of the cases they cite.  For all these reasons, the court grants summary judgment against

Dustech's breach of contract claim.

## V.   Breach of Good Faith and Fair Dealing Claim (Count II)

Next, Compass asks the court to grant summary judgment against Dustech's claim for

breach of the duty of good faith and fair dealing (Count II).  Dustech claims that Compass

breached its duty of good faith and fair dealing when it failed to inspect rejected material.

Compass argues that the implied covenant doesn't apply here because the parties' contract

---

[15]     Dustech also cites *Advent Systems Ltd. v. Unisys Corp.*, 925 F.2d 670, 678 (3d Cir. 1991) as an example of a court finding "a valid non-exclusive requirements contract." *See* Doc. 145 at 32 (Pl.'s Opp'n).  But in that case, the Third Circuit reversed the district court's judgment that the transaction at issue fell outside of the scope of the Uniform Commercial Code.  Then, the Third Circuit explained that because the parties "were obviously aware that they were entering a new, speculative market and some uncertainty was inevitable in the amount of sales [that seller] could make and the orders it would place with [buyer].  Consequently, quantity was not stated in absolute terms.  In effect, the parties arrived at a non-exclusive requirements contract, a commercially useful device."  *Advent Sys.*, 925 F.2d at 678. *Advent Systems Limited*—considering its unique facts and procedural posture—is of limited value here.

expressly governs inspection of rejected material. The court agrees, and thus, it grants summary judgment against this claim.

Delaware law attaches an implied covenant of good faith and fair dealing to every contract, and it "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (citation and internal quotation marks omitted). But the "implied covenant does not apply when the subject at issue is expressly covered by the contract." *Alltrista Plastics, LLC v. Rockline Indus., Inc.*, No. CV N12C-09-094 JTV, 2013 WL 5210255, at *7 (Del. Super. Ct. Sept. 4, 2013) (citations and internal quotation marks omitted). The court grants summary judgment against this claim for two reasons.

*First*, the parties' Second Supply Agreement expressly covers the subject at issue—the alleged failure to inspect the material. And, as already noted, the implied covenant doesn't apply to an issue "expressly covered by the contract." *Alltrista Plastics*, 2013 WL 5210255, at *7 (citations and internal quotation marks omitted); *see also Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 770 (Del. Ch. 2009) ("[T]he implied covenant only applies where a contract lacks specific language governing an issue and the obligation the court is asked to imply advances, and does not contradict, the purposes reflected in the express language of the contract."), *aff'd*, 976 A.2d 170 (Del. 2009). Dustech premises its breach of good faith and fair dealing claim on Compass's alleged "failure to comply with the contract provision requiring rejected material to be evaluated by a credible licensed third-party laboratory[.]" Doc. 132 at 11 (Pretrial Order ¶ 4.a.ii.); *see also* Doc. 88 at 7–8 (Pl.'s Mem. in Support of S.J.). The Second Supply Agreement's "Inspection" provision expressly governs

inspection of rejected material.  *See* Doc. 107-2 at 9 (Second Supply Agreement Schedule C ¶ 13).  Thus, the implied covenant doesn't impose a duty or a subject already addressed— explicitly—by the contract.

> *Second*, for the same reasons the court grants summary judgment against Dustech's breach of contract claim, it also must grant summary judgment against its breach of good faith and fair dealing claim.  Dustech claims that the "essential ingredient of good faith in a case of a buyer reducing its estimated requirements is that it not merely have had second thoughts about the terms of the contract and want to get out of it."  *See* Doc. 146-11 at 12 (Pl.'s Reply).  But no requirements contract existed here.  And because the Second Supply Agreement didn't obligate Compass to buy all the dust suppressant oil it required from Dustech—or even a fraction of it— Dustech's claim for breach of this implied duty fails as a matter of law.

> For both of these reasons, the court grants summary judgment against Dustech's second claim, one claiming breach of the implied duty of good faith and fair dealing.

## VI.   Conclusion

> Dustech sued Compass for breach of contract and breach of good faith and fair dealing.  As the basis for its claims, Dustech relied on an inspection provision in the parties' contract.  But the court can't reach that issue, because Dustech fails to present a genuine dispute that Compass owed Dustech a duty to buy Dustech's product in the first place.  It didn't.  For these reasons, the court grants Compass summary judgment against Dustech's claims and denies Dustech's summary judgment motion seeking judgment in its favor on the same claims.

> **IT IS THEREFORE ORDERED BY THE COURT THAT** Compass's Cross Motion for Summary Judgment (Doc. 105) is granted.

32

**IT IS FURTHER ORDERED BY THE COURT THAT** Dustech's Motion for

Summary Judgment (Doc. 87) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** Dustech's Motion for Oral

Argument (Doc. 148) is denied.

**IT IS SO ORDERED.**

**Dated this 4th day of August, 2023 at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
